Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| JONATHAN ROMÁN SANTIAGO<br><br>Parte Recurrida<br><br>v.<br><br>COST CONTROL COMPANY, INC.<br><br>Parte Recurrente | KLRA202400387 | Revisión administrativa procedente del Departamento del Trabajo y Recursos Humanos<br><br>Caso Núm.: AC-21-259<br><br>Sobre: Despido Injustificado (Ley Núm. 80-1976) |
|---|---|---|

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio y el Juez Rodríguez Flores

Rodríguez Flores, juez ponente

## SENTENCIA

En San Juan, Puerto Rico, a 27 de febrero de 2025.

Comparece Cost Control Company, Inc. (CCC) mediante *Solicitud de Revisión Judicial*, solicitando que revoquemos la *Resolución* y *Orden* emitida por la Oficina de Mediación y Adjudicación (OMA), adscrita al Departamento del Trabajo y Recursos Humanos, emitida el 30 de mayo de 2024 y notificada el 31 de mayo de 2024. El referido dictamen declaró Con Lugar la *Querella* presentada por Jonathan Román Santiago (señor Román), determinando que éste fue despedido injustificadamente y, por consiguiente, debía recibir el beneficio de la mesada conforme lo establecido en la Ley Sobre Despidos Injustificados, Ley Núm. 80 de 30 de mayo de 1976 (Ley 80-1976), según enmendada, 29 LPRA sec. 185a.[1]

Examinado el escrito a la luz del derecho aplicable, la transcripción de la prueba oral presentada ante nosotros y por los

---

[1] Apéndice de la Revisión Judicial, Anejo 3, págs. 24-70.

fundamentos que expondremos a continuación, se confirma la *Resolución* recurrida.

## I.

El señor Román comenzó a laborar en CCC el 12 de abril de 2016[2], como técnico de reparaciones (Handyman), hasta el 30 de octubre de 2020, tras su despido.[3] Ante su terminación de empleo, el señor Román presentó la *Querella* AC-21-259, ante el Departamento del Trabajo y Recursos Humanos, el 21 de julio de 2021. En la misma alegó que fue despedido injustificadamente por CCC.[4]

El Departamento de Trabajo y Recursos Humanos notificó a CCC sobre la presentación de la *Querella* en su contra y la celebración de la correspondiente vista administrativa.[5]

El 31 de agosto de 2021, CCC contestó la querella y arguyó que el motivo del despido del señor Román era la terminación del contrato de administración que tenía CCC con la Administración de Vivienda Pública (AVP). Es decir, que la necesidad de emplear al señor Román dependía de dicho contrato.[6] CCC, en la alternativa, alegó que apareció evidencia con posterioridad al despido que justificaba el mismo. Asimismo, CCC alegó que cumplió en notificarle al señor Román conforme al reglamento de AVP y las disposiciones del "Worker Adjustment and Retraining Notification Act" (WARN Act).[7] En esta primera alegación responsiva, CCC nunca alegó reorganización de las operaciones.

Tras varios trámites procesales, el 9 de enero de 2024, se celebró la vista administrativa. La señora Sacha Roldán, oficial de

---

[2] Conforme a lo establecido en el Art. 1.2 de la Ley de Transformación y Flexibilidad Laboral, (Ley Núm.4-2017), según enmendada, 29 LPRA sec. 121a, no le es de aplicación la citada ley.
[3] Apéndice de la Revisión Judicial, Anejo 12, pág. 208.
[4] *Íd.,* Anejo 12, págs. 208-210.
[5] *Íd.,* Anejo 12, págs. 205-207.
[6] *Íd.,* Anejo 11, págs. 194-195.
[7] *Íd.,* Anejo 11, pág. 194.

recursos humanos, fue la única que testificó en representación de CCC. Por la parte querellante, solo testificó el señor Román.

La señora Roldán inició su testimonio indicando que comenzó a trabajar en CCC en marzo del 2018 y que su posición era Oficial de Recursos Humanos de CCC.[8] Ella era la encargada de velar por los procedimientos, normas y desempeño en el área laboral y otras labores administrativas.

La señora Roldán también explicó a grandes rasgos que la relación de CCC y AVP era una contractual por intervalos de cuatro años, una vez le era adjudicada la correspondiente subasta sobre administración de residenciales públicos. También explicó las posibilidades de cancelación del contrato por parte de AVP, así como la no contratación por periodos de tiempo. Con relación al señor Román, afirmó que éste había firmado un contrato probatorio el 7 de abril de 2016.[9] En el mencionado contrato probatorio existía una cláusula que establecía la terminación automática de su empleo si expiraba el contrato entre AVP y CCC.[10]

Como parte de sus funciones de recursos humanos, la señora Roldán declaró que, el 31 de agosto de 2020, envió una carta para informar a todos los empleados sobre la posible finalización del contrato con AVP. Esta notificación se realizó ante la eventual terminación del contrato entre AVP y CCC el 31 de octubre de 2020.[11] El propósito de la carta era alertar a los empleados sobre la probabilidad de no volver a tener un contrato con AVP y, consecuentemente, la perdida de sus respectivos empleos.[12]

Así las cosas, ella testificó que, el 30 de octubre de 2020, CCC remitió una carta al señor Román, donde se le indicaba que su empleo expiraba el 31 de octubre de 2020, ante la finalización del

---

[8] TPO del 9 de enero de 2024, pág. 5, líneas 5-9.
[9] TPO del 9 de enero de 2024, pág. 16, líneas 3-5.
[10] TPO del 9 de enero de 2024, pág. 14, líneas 17-22.
[11] TPO del 9 de enero de 2024, pág. 14, líneas 13-16.
[12] TPO del 9 de enero de 2024, pág. 14, líneas 19-21.

contrato de AVP con CCC.[13]   No obstante, durante el contrainterrogatorio, la señora Roldán confirmó que, a pesar de no estar segura, entiende que el nuevo contrato de AVP y CCC se firmó a los dos días de expirado el primer contrato.[14]  También confirmó que se adjudicó a CCC nuevamente el Área 11 y se les asignó los mismos residenciales del contrato anterior.[15]

Sobre este particular, la señora Roldán expresó que a los empleados considerados para volver a laborar con CCC, se les realizó una nueva oferta de empleo.[16]  En su testimonio, la señora Roldán explicó que, a la luz del nuevo contrato, hubo una necesidad de recontratar a los empleados despedidos ante la obligación de ocupar esas plazas.[17]  Sin embargo, afirmó que al señor Román no se le realizó una oferta de empleo ante la falta de necesidad de su empleo, de acuerdo a los servicios solicitados en el nuevo contrato.[18]

Luego de celebrada la vista y sometidos los Memorandos de Derecho, OMA dicta su *Resolución* y *Orden*[19] el 30 de mayo de 2024, con las determinaciones de hechos y derecho que se transcriben a continuación:

1. El querellante comenzó a trabajar para Cost Control Company, Inc. el 12 de abril de 2016 hasta el 31 de octubre de 2020.
2. El querellante firmó el *Contrato de Empleo Probatorio.*
3. El querellante no firmó otro contrato de empleo con la querellada que no fuera el Contrato de Empleo Probatorio.
4. El querellante ocupó un puesto de técnico de reparación (handyman) para la querellada.
5. El salario más alto devengado por el querellante fue OCHO DÓLARES CON SETENTA Y CUATRO CENTAVOS ($8.74) por hora.
6. Cuando CCCI participa de subastas no tiene certeza de ser la parte agraciada.

---

[13] TPO del 9 de enero de 2024, pág. 21, líneas 20-25.
[14] TPO del 9 de enero de 2024, pág. 38, líneas 2-5.
[15] TPO del 9 de enero de 2024, pág. 52, líneas 22-24.
[16] TPO del 9 de enero de 2024, pág. 38, líneas 18-21.
[17] TPO del 9 de enero de 2024, pág. 51, líneas 13-16.
[18] TPO del 9 de enero de 2024, pág. 40, líneas 14-17.
[19] *Íd.,* Anejo 3, págs. 24-70.

7. CCCI no siempre fue agraciada en las subastas de la AVP para administrar residenciales públicos.

8. El 19 de septiembre de 2014, la AVP publicó la solicitud de propuestas (RFP) ARV- RFP-14-15-03 para recibir propuestas técnicas y financieras para la administración de residenciales públicos en el Área 11.

9. El 24 de octubre de 2014, la querellada sometió ante la AVP una propuesta para ser agente administrador del Área 11.

10. El 13 de octubre de 2015, la querellada y la AVP suscribieron el contrato *Management Agent Services Agreement Low-Income Housing Tax Credit* (en adelante "Agreement").

11. El contrato entre CCCI y la AVP se otorgó luego de la celebración de una subasta pública en la que participó la querellada.

12. El *Agreement* tenía fecha de efectividad el 1 de noviembre de 2015 al 31 de octubre de 2019.

13. El *Agreement* fue renovado por la AVP a vencer el 31 de octubre de 2020.

14. La querellada administraba residenciales públicos alrededor de todo Puerto Rico.

15. El *Agreement* establece que es deber de la querellada contratar, mantener y proveer los empleados para el cumplimiento de las labores contratadas.

16. Es deber exclusivo de la querellada suplir los empleados que administran, reparan y mantienen los residenciales públicos.

17. El querellante es residente del Residencial La Ceiba en Ponce.

18. El 7 de abril de 2016, en el residencial público Arístides Chavier, el Sr. Jonathan Román Santiago firmó el Contrato de Empleo Probatorio con la querellada que expresaba lo siguiente:

El presente acuerdo constituye un contrato de empleo de carácter probatorio por el periodo de 90 días entre Cost Control Company (en adelante "la compañía") y **JONATHAN ROMÁN SANTIAGO** (en adelante "el empleado") extendible por 90 días adicionales, a opción de Cost Control Company a tenor con la ley.

Conforme acuerdan las partes, el [empleado] por virtud de este acuerdo, queda contratado para rendir servicios como empleado de la compañía en calidad de TÉCNICO DE REPARACIÓN mediante contrato de empleado probatorio efectivo al **11 DE ABRIL DE 2016**. El término de empleo aquí pactado expirará cumplido el término de 90 días contados a partir de la fecha de efectividad antes señalada, esto es hasta el **9 DE JULIO DE 2016**. En ese momento terminará la relación de empleo entre las partes sin necesidad de notificación alguna por parte de la compañía al empleado, a menos de previo a expiración de ese término, la compañía le notifique su determinación de empleado por tiempo indeterminado, o de extender por 90 días adicionales su contrato de empleo probatorio. Excepto en tales casos, el empleo

del empleado termina automáticamente y no debe reportarse a trabajar nuevamente.

Durante la vigencia de este contrato, o de cualquier extensión del mismo, la compañía, en cualquier momento podrá prescindir, con o sin causa, de los servicios del empleado, y dar por terminado su empleo anticipadamente. Si el empleado no cumple a cabalidad con sus tareas o de algún modo no llena las expectativas de la compañía, podrá ser cesanteado sin notificación previa, ni obligación alguna por parte de la Compañía de compensarle en forma alguna, en cualquier momento durante la vigencia de este contrato o su extensión. De igual modo, el empleado está libre de resolver este contrato en cualquier momento. Igualmente, el empleado reconoce que las labores para las que es contratado se derivan de un contrato para la administración de residenciales públicos entre la compañía y la Administración de Vivienda Pública, razón por la cual si ese contrato quedara sin efecto, expirara o fuera cancelado o resuelto por cualquier de las partes, la compañía habrá de prescindir de los servicios del empleado automáticamente, asistiéndole justa causa para ello, ya durante su periodo probatorio o en cualquier momento posterior.
....
El propósito del periodo probatorio es dar la oportunidad al empleado de demostrar sus aptitudes y capacidad para llevar a cabo las tareas que le sean asignadas y cumplir con los horarios requeridos y permite a la empresa evaluar adecuadamente si el empleado está capacitado para desempañar satisfactoriamente las funciones de su puesto, evaluar su cumplimiento con las normas de la empresa, su carácter moral, capacidad de laborar en grupo, capacidad de trabajar bajo presión, actitud hacia el trabajo y capacidad para seguir instrucciones, necesidad de servicio brindado, entre otras; para determinar si le resulta conveniente contratarlo de forma regular. Lo anterior, a base del criterio exclusivo unilateral de la empresa por lo que le (sic) empleado no puede albergar expectativa alguna de continuidad en su empleo durante el periodo probatorio o su extensión. Dicho periodo probatorio provee a su vez para que el empleado determine si desea laborar para la compañía.

Durante la vigencia de este contrato, la compañía retendrá del pago de salarios al empleado, todas aquellas partidas que es menester retener en virtud de ley. No obstante, a pesar de tener que acogerse a los beneficios mandatorios de ley, durante la vigencia de este contrato, el empleado no será elegible para recibir los beneficios marginales de los empleados regulares de la empresa. Al finalizar su periodo de empleo probatorio y no siendo contratado como empleado regular, el empleado deberá devolver a la empresa toda propiedad y/o materiales que le hayan sido suministrados, de la naturaleza que

fueren y devolverá todo tipo de archivos de información documental o electrónica de la compañía de la cual se encuentre en posesión.

Este contrato podrá ser renovado por el término adicional de 90 días adicionales, previa notificación al empleado y solicitud al Departamento de Trabajo y Recursos Humanos de Puerto Rico; si al finalizar el mismo la compañía entiende que no se encuentra en plena capacidad de determinar si le resulta satisfactorio o conveniente ofrecer un contrato de empleo permanente al empleado.
...

19. El *Contrato de Empleo Probatorio* era efectivo del 11 de abril de 2016 hasta el 9 de julio de 2016, un período de noventa (90) días o tres meses.
20. El *Contrato de Empleo Probatorio* tenía una opción de renovación por 90 días adicionales.
21. El 7 de abril de 2016, el querellante firmó la *Descripción de deberes y Funciones* del puesto de Técnicos de Reparación (Handyman).
22. El querellante trabajaba una jornada semanal de cuarenta (40) horas mediante contrato a tiempo indeterminado.
23. Cost Control Company, Inc. es una compañía dedicada a la administración de vivienda pública, brindando servicios de mantenimiento, servicio de administración y servicios a los residentes de los residenciales públicos.
24. La querellada asignó al querellante a trabajar en el residencial público Arístides Chavier en el Municipio de Ponce.
25. El residencial Arístides Chavier tiene 493 apartamentos.
26. En el residencial Arístides Chavier, la querellada tenía asignado 6 handyman o técnicos de reparación en adición al querellante.
27. El *Contrato de Empleo Probatorio* venció el 9 de julio de 2016, cuando CCCI optó por no prorrogar el mismo por un periodo de 90 días adicionales.
28. El 9 de julio de 2016, tras vencerse el *Contrato de Empleo Probatorio* la querellada no suscribió o extendió un nuevo contrato de empleo con el querellante.
29. El 9 de julio de 2016, el querellante advino como empleado regular por tiempo indeterminado de CCCI.
30. La querellada notificaba los documentos a sus empleados de forma personal y estos acusaban recibo de la entrega.
31. CCCI tiene una oficina administrativa en cada residencial público que opera y tiene a cargo un administrador y supervisor.
32. El personal de recursos humanos de CCCI está ubicado en las oficinas centrales en San Juan y no en las oficinas administrativas de los residenciales públicos.
33. La Sra. Sasha Roldán como oficial de recursos humanos trabaja en la oficina central y no tenía contacto alguno con el querellante.

34. Durante el tiempo que el querellante laboró para la querellada la Sra. Sasha Roldán nunca interactuó con el querellante.

35. La Sra. Sasha Roldán no conoce al querellante, pero sabe que trabajó para Cost Control Company, Inc.

36. La Sra. Sasha Roldán desconoce si la carta del 31 de agosto de 2020, sobre posible intención de despido le fue entregada al querellante.

37. La carta del 31 de agosto de 2020 no tiene la firma del querellante.

38. La carta del 31 de agosto de 2020, no le fue entregada al querellante personalmente, por correo electrónico o correo postal.

39. La querellada tenía más de cien (100) empleados prestando servicios a residenciales públicos mediante un contrato con la AVP.

40. La querellada no notificó al querellante de su posible cesantía 60 días antes como requiere el WARN Act.

41. El 30 de octubre de 2020, el querellante fue despedido mediante carta del puesto de técnico de reparación (handyman) para el que laboraba con la querellada.

42. La carta de despido del 30 de octubre de 2020, le fue entregada al querellante personalmente en la oficina administrativa del residencial Arístides Chavier luego de las 1:00 pm tras regresar de almuerzo, acusando de recibo de la misma.

43. La razón para el despido era la alegada expiración del contrato de la querellada y AVP.

44. El día del despido al querellante no se le pagaron las liquidaciones.

45. La querellada le pagó al querellante sus liquidaciones dos meses y medio después de su despido.

46. Al momento del despido, el querellante llevaba trabajando para el patrono querellado más de cuatro (4) años.

47. **La Sra. Sasha Roldán admitió que el contrato entre la querellada y AVP se renovó en dos (2) días o menos del despido del querellante.**

48. **El 30 de octubre de 2020, se renovó el contrato entre la querellada y la AVP.**

49. **Al momento del despido se había renovado el contrato entre la querellada y la AVP.**

50. **Todos los empleados que fueron cesanteados junto al querellante fueron recontratados.**

51. Tras la renovación del contrato entre CCCI y la AVP se realizaron contratos de empleos nuevos a los empleados despedidos.

52. La querellada no le realizó oferta de empleo nuevo al querellante.

53. Luego de la recontratación entre la querellada y la AVP el puesto de técnico de reparación (handyman) seguía siendo un puesto necesario, conveniente y continuo para las operaciones de la querellada.

54. Sin el puesto de técnico de reparación (handyman) la querellada no pudiera hacer las labores que está obligada hacer en virtud de su contrato con la AVP.

55. Tras la renovación del contrato entre CCCI y la AVP, la querellada continuó administrando el Área 11 de la Región de Ponce y los cuatro (4) residenciales

públicos, incluyendo en el que laboraba el querellante.

56. La querellada no demostró mal desempeño o amonestaciones que hubiera recibido el querellante mientras laboró como su empleado.

57. La querellada no probó que el querellante tuviera un mal desempeño mientras laboró por más de cuatro (4) años.

58. No se probó que luego del despido del querellante existiera evidencia que demostrara que durante su desempeño incumplió con sus funciones o su trabajo fuera deficiente.

59. La querellada no recontrató a los empleados despedidos siguiendo los criterios de antigüedad sino seleccionándolos a su discreción, a los que decidía a cuáles ofrecerles contratos nuevos y cuáles no.

60. Tras la renovación del contrato entre la AVP y la querellada, CCCI necesitaba llenar los puestos vacantes de técnico de reparación (handyman) para poder continuar brindando servicios de administración de residenciales públicos.

61. Los puestos recontratados tras el despido del querellante son de igual categoría y clasificación ocupacional al que tenía el querellante.

62 La recontratación de los empleados ocurrió dentro de los seis (6) meses siguientes a la cesantía del querellante.

63. Tras ser despedido el querellante acudió al Negociado de Normas de Trabajo, quienes tras realizar su investigación de la reclamación del querellante cursaron dos (2) cartas de cobro al patrono querellado, a saber: el 4 de enero de 2021 y el 28 de enero de 2021.

64. El querellante tenía una compensación semanal de TRESCIENTOS CUARENTA Y NUEVE DÓLARES CON SESENTA CENTAVOS ($349.60).

65. El querellante reclamó una mesada básica de despido injustificado por la cantidad de TRES MIL VENTISIETE DÓLARES CON CINCUENTA Y CUATRO CENTAVOS ($3,027.54).

66 El querellante también reclamó por concepto de despido injustificado la indemnización progresiva equivalente a cuatro (4) semanas de sueldo (una semana por cada año trabajado) ascendente a MIL TRESCIENTOS NOVENTA Y OCHO DÓLARES CON CUARENTA CENTAVOS ($1,398.40).

67. La cuantía total reclamada por el querellante por concepto de despido injustificado asciende a la cantidad total de CUATRO MIL CUATROCIENTOS VEINTICINCO DÓLARES CON NOVENTA Y CUATRO CENTAVOS ($4,425.94).

68. El despido del querellante fue sin causa.

69. El despido del querellante fue arbitrario y caprichoso.

70. La querellada no recontrató al querellante luego de su despido a pesar de que necesitaba llenar plazas de igual clasificación ocupacional y categoría para continuar brindando los servicios de administración de residenciales públicos a la AVP.

71. La querellada no siguió los criterios de antigüedad en la recontratación.

72. La querellada aplicó criterios arbitrarios y caprichosos en la recontratación de los empleados despedidos.

73. La querellada le adeuda al querellante la cantidad de CUATRO MIL CUATROCIENTOS VEINTICINCO DÓLARES CON NOVENTA Y CUATRO CENTAVOS ($4,425.94). (Énfasis original y notas al calce omitidas).

Ante las determinaciones de hechos y conclusiones de derecho, OMA resolvió que el despido del señor Román fue uno injustificado. Por lo que ordenó a CCC pagar al señor Román la cantidad de cuatro mil cuatrocientos veinticinco dólares con noventa y cuatro centavos ($4,425.94) en concepto de despido injustificado.

En desacuerdo con el dictamen, el 20 de junio de 2024, CCC radicó una *Moción de Reconsideración* ante OMA[20], la cual fue declarada no ha lugar.[21]

Inconforme con tal determinación, el señor Román Santiago acudió ante nos el 19 de julio de 2024, e imputó al foro administrativo los siguientes errores:

PRIMER ERROR: ERRÓ EL EXAMINADOR AL BASAR SUS DETERMINACIONES DE HECHO EN ESPECULACIONES Y EN INFERENCIAS INFUNDADAS SIN BASE EN LA PRUEBA DESFILADA VIOLENTANDO ASÍ EL DERECHO DE CCC A UN DEBIDO PROCESO DE LEY.

SEGUNDO ERROR: ERRÓ EL EXAMINADOR AL RESOLVER QUE LA JUSTIFICACIÓN EXCLUSIVA PARA EL DESPIDO FUE LA POSIBLE CANCELACIÓN FUTURA DEL CONTRATO ENTRE CCC Y AVP, Y NO UNA DECISIÓN BASADA EN EL HECHO DE QUE, TRAS LA CANCELACIÓN DEL CONTRATO VIGENTE ENTRE CCC Y AVP, CCC SUSCRIBIÓ UN NUEVO CONTRATO CON LA AVP QUE ALTERABA LAS CONDICIONES CONTRACTUALES PREVIAS.

TERCER ERROR: ERRÓ EL EXAMINADOR AL DETERMINAR QUE SE TRATÓ DE UN DESPIDO INJUSTIFICADO BASADO EN CONDUCTA IMPROPIA DEL QUERELLANTE Y NO EN LA CAUSA DE CIERRE PARCIAL Y TEMPORERO Y REORGANIZACIÓN DE OPERACIONES QUE RECONOCE LA LEY.

En síntesis, CCC alegó que evidenció con claridad la dependencia contractual que existía entre AVP y CCC. Además,

---

[20] *Íd.,* Anejo 2, págs. 4-23.
[21] *Íd.,* Anejo 1, págs. 1-3.

expresó que el señor Román tenía conocimiento de que su empleo podía culminar de alterarse o finalizar el contrato con AVP. CCC también argumentó que el contrato de empleo del señor Román no fue renovado, no tan solo por la extinción del contrato con AVP, sino también por los cambios operaciones que venían con el nuevo contrato de AVP. Por ende, el señor Román Santiago no fue contratado nuevamente por los cambios operacionales requeridos de acuerdo con el nuevo contrato. Consecuentemente, CCC alegó que se le violentó su debido proceso de ley en virtud de no considerar la reorganización operacional de la compañía ante la prueba desfilada.

En resumen, CCC entendió que el despido del señor Román fue justificado conforme al Art. 2 (e) de la Ley 80-1976, según enmendada, *supra*, por tratarse de una reorganización de la empresa y porque fuese necesario para el mejor funcionamiento de CCC.

**II.**

**A.**

Es norma firmemente establecida que los tribunales apelativos han de conceder gran consideración y deferencia a las decisiones de los organismos administrativos. Ello, dado que las agencias administrativas cuentan con vasta experiencia y conocimiento especializado en cuanto a los asuntos que les han sido encomendados. *Moreno Lorenzo y otros v. Depto. Fam.*, 207 DPR 833, 839 (2021), citando a *OCS v. Universal*, 187 DPR 164, 178 (2012); *The Sembler Co. v. Mun. de Carolina*, 185 DPR 800 (2012); *Pagán Santiago, et al. v. ASR*, 185 DPR 341, 358 (2012).

Como resultado, la decisión de una agencia administrativa gozará de una presunción de legalidad y corrección que será respetada, siempre que la parte que la impugna no produzca

evidencia suficiente para rebatirla. *Transp. Sonell, LLC v. Jta. Subastas ACT,* 214 DPR ___ (2024), 2024 TSPR 82; *Batista, Nobbe v. Jta. Directores,* 185 DPR 206, 215 (2012). Así, en cuanto a las determinaciones de hecho que realiza una agencia, el Tribunal Supremo ha resuelto que los tribunales revisores tienen que sostenerlas si se encuentran respaldadas por evidencia suficiente que surja del expediente administrativo al ser considerado en su totalidad. *Pacheco v. Estancias,* 160 DPR 409, 432 (2003). Véase, además, Sec. 4.5 de la LPAU, 3 LPRA sec. 9675. Por evidencia sustancial se entiende "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". *Rolón Martínez v. Superintendente,* 201 DPR 26, 36 (2018); *González Segarra et al. v. CFSE,* 188 DPR 252, 277 (2013); *Otero v. Toyota,* 163 DPR 716, 728-729 (2005).

Por lo tanto, la parte afectada deberá reducir el valor de la evidencia impugnada o demostrar la existencia de otra prueba que sostenga que la actuación del ente administrativo no estuvo basada en evidencia sustancial. *Otero v. Toyota,* supra, pág. 728. En fin, el tribunal debe limitar su intervención a evaluar si la determinación de la agencia es razonable, ya que se persigue evitar que el tribunal revisor sustituya el criterio de la agencia por el suyo. *Íd.*

Por otro lado, respecto a las conclusiones de derecho, la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico,* Ley Núm. 38-2017, señala que éstas pueden ser revisadas en todos sus aspectos. Sec. 4.5 de la LPAU, 3 LPRA sec. 9675. Ahora bien, lo anterior "no implica que los tribunales revisores tienen la libertad absoluta de descartar libremente las conclusiones e interpretaciones de la agencia". *Otero v. Toyota,* supra, pág. 729. Consecuentemente, cuando un tribunal llega a un resultado distinto al de la agencia, éste debe determinar si la divergencia es a consecuencia de un ejercicio razonable y

fundamentado de la discreción administrativa, ya sea por la pericia, por consideraciones de política pública o en la apreciación de la prueba. *Íd.* Dicho de otro modo, "[e]l tribunal podrá sustituir el criterio de la agencia por el propio solo cuando no pueda hallar una base racional para explicar la decisión administrativa". *Íd.*

Por consiguiente, la deferencia concedida a las agencias administrativas únicamente cederá cuando: (1) la determinación administrativa no esté basada en evidencia sustancial; (2) el organismo administrativo haya errado en la aplicación o interpretación de las leyes o los reglamentos que se le ha encomendado administrar; (3) cuando el organismo administrativo actúe arbitraria, irrazonable o ilegalmente, al realizar determinaciones carentes de una base racional; o, (4) cuando la actuación administrativa lesione derechos constitucionales fundamentales. *Super Asphalt v. AFI y otros,* 206 DPR 803, 819 (2021); *Torres Rivera v. Policía de Puerto Rico,* 196 DPR 606, 628 (2016); *IFCO Recycling v. Aut. Desp. Sólidos*, 184 DPR 712, 744-745 (2012).

**B.**

El Art. 2 de la Ley 80-1976, según enmendada, *supra*, establece, en lo atinente, que:

> Se entenderá por justa causa para el despido de un empleado aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono. Además, se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento que incluyen, entre otras, las siguientes:
> (a) Que el empleado incurra en un patrón de conducta impropia o desordenada.
> (b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.
> (c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia

escrita de los mismos se haya suministrado oportunamente al empleado.

(d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.

(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.

[...]

La mencionada ley fue aprobada con el fin primordial de proteger "de una forma más efectiva el derecho del obrero puertorriqueño a la tenencia de su empleo mediante la aprobación de una ley que, a la vez que otorgue unos remedios más justicieros y consubstanciales con los daños causados por un despido injustificado, desaliente la incidencia de este tipo de despido". *Feliciano Martes* v. *Sheraton*, 182 DPR 368, 379 (2011). Encima, los empleados que se puedan beneficiar de esta ley tienen que ser de comercio, industria o cualquier otro negocio o sitio de empleo que: (1) estén contratados sin tiempo determinado; (2) reciban una remuneración, y (3) sean despedidos de su cargo sin que haya mediado justa causa. *Rivera Figueroa* v. *The Fuller Bush Co.*, 180 DPR 894, 906 (2001). Se define como justa causa para el despido la que tiene origen para el buen funcionamiento de la empresa y no al libre arbitrio del patrono. *Srio. del Trabajo* v. *I.T.T.*, 108 DPR 536, 542 (1979). Ahora bien, los patronos deben pagar una mesada a los empleados que son despedidos sin justa causa. *SLG Zapata* v. *J.F Montalvo*, 189 DPR 414, 424 (2013). Todo despido que no fuese basado en una justa causa es considerado injustificado y en el cual el empleado recibe el beneficio de un remedio exclusivo. *Díaz* v. *Wyndham Hotel Corp.*, 155 DPR 364, 378 (2001). El patrono

tiene el peso probatorio de demostrar que el despido fue uno justificado por medio de preponderancia de la prueba, de lo contrario se presume que fue injustificado. *Íd.,* pág. 388. Como cuestión de umbral, para que el empleado se beneficie de la presunción, esta se activa si: fue empleado de un comercio, industria u otro negocio; su contrato era por tiempo indeterminado; recibía remuneración por su trabajo, y que fue despedido de su puesto. *Rivera Figueroa* v. *The Fuller Bush Co.*, supra, pág. 907.

### III.

Por estar relacionados los señalamientos de error, procedemos a discutirlos en conjunto. Veamos.

Hemos esbozado anteriormente que las determinaciones que realizan las agencias administrativas merecen la mayor deferencia y no deben ser alteradas. Dicha norma está basada en que las agencias administrativas poseen un conocimiento especializado y presunción de corrección. Ahora bien, estamos autorizados a alterar las determinaciones del foro administrativo si no están basadas en evidencia sustancial que surja del expediente.

Por otro lado, si bien es cierto que un patrono puede despedir en ciertas circunstancias a un empleado -incluyendo cuando ocurre una reorganización empresarial según lo establece el Art. 2 de la Ley 80-1976, *supra-* el patrono tiene que demostrar que el despido estuvo justificado por dicha reorganización; pues, de no demostrarlo, al empleado le beneficia la presunción de que el despido fue injustificado.

Tras un examen minucioso y riguroso del expediente y de la transcripción del testimonio de la señora Roldán (única testigo de CCC), hemos determinado que no debemos alterar las determinaciones y conclusión a las que llegó OMA.

CCC, en síntesis, arguye que OMA llegó a sus determinaciones de hecho y conclusiones de derecho basado en especulaciones e inferencias infundadas sin base en la prueba. No le asiste la razón.

La prueba claramente estableció que el nuevo contrato entre AVP y CCC fue firmado aproximadamente dos días después del vencimiento del contrato original. En este nuevo contrato le asignaron a CCC los mismos residenciales y el Área 11 del contrato anterior. La prueba presentada no demostró que el contrato sufrió algún cambio en comparación con el anterior. La señora Roldán nunca declaró si participó en el proceso de la contratación de CCC y AVP o de las necesidades operacionales a la luz del nuevo contrato.

Una vez otorgado el nuevo contrato entre AVP y CCC, fueron recontratados los compañeros del señor Román que habían sido despedidos, menos él. Del testimonio de la señora Roldán, surgió que las funciones de técnico de reparación (Handyman) eran necesarias para los servicios que se ofrecen en los residenciales que ellos administran.

Del expediente administrativo tampoco surge prueba alguna que explique en que consistió la reorganización de CCC, que justificara no recontratar al señor Román. La señora Roldán nunca mencionó nada con relación a la reorganización de CCC y el señor José R. Martínez[22] nunca testificó. Entendemos que el argumento de una reorganización, sin prueba, fue sin duda un mero pretexto para no recontratar al señor Román.

CCC intentó justificar, en la alternativa, que el señor Román no fue recontratado aplicando la doctrina "*After Acquired Evidence*"[23]. Sin embargo, de la prueba presentada tampoco surgió cuál fue esa evidencia adquirida después del despido que así lo

---

[22] Es la persona firmante como Presidente en la carta del 30 de octubre de 2020.
[23] Esa doctrina fue incluida como defensa en la contestación a la querella, más nunca se presentó evidencia admisible que la sustentara.

justificara.  El récord está totalmente carente de prueba admisible que demostrara que el señor Román fue indisciplinado o que incumplía con los deberes de su puesto.

En fin, CCC no demostró que existiese alguna evidencia en el expediente, que ameritara que alteráramos las determinaciones de OMA.  Entendemos que el Oficial Examinador de OMA fue detallado, ponderado y sus determinaciones estuvieron basadas en la prueba presentada.

Consecuentemente, OMA salvaguardó el debido proceso de ley de CCC y actuó correctamente al determinar que nada impedía la recontratación de la parte recurrida.  Por lo tanto, OMA no erró en adjudicar que CCC despidió injustificadamente al señor Jonathan Román Santiago.  En virtud de lo anterior, ordenamos a la parte recurrente a cumplir con lo ordenado por OMA.

**IV.**

Por los fundamentos antes expuestos, confirmamos la *Resolución* recurrida.

Notifíquese.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones